Third Division

March 29, 2002

No. 1-99-4471 

CONTINENTAL CASUALTY COMPANY, INC., )    Appeal from the 

assignee of GENERAL AUTOMATION, INC., )    Circuit Court  )    of Cook County.

Plaintiff-Appellant, )

) 

v. ) No. 97 L 5050

)

AMERICAN NATIONAL BANK AND ) Honorable 

TRUST COMPANY OF CHICAGO, ) David G. 

) Lichtenstein,

Defendant-Appellee. ) Judge Presiding

PRESIDING JUSTICE HALL delivered the opinion of the court:

Plaintiff, General Automation, Inc. (GAI), 
appeals from the November 23, 1999, order denying its motion to reconsider.  On April 30, 1997, GAI filed a two-count complaint against defendant, 
American National Bank (ANB).  
Count I sought damages for common law breach of contract, and count II sought damages for violation of section 9 of the Illinois Uniform Fiduciaries Act (the Act) (760 ILCS 65/9 (West 1996)).  GAI eventually assigned all of its causes of action, rights and claims it had against ANB to the Continental Casualty Insurance Company. 

On June 2, 1999, ANB moved to dismiss GAI’s seventh complaint pursuant to sections 2-615 and 2-619 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619 (West 1998)), on the grounds that the complaint was substantially insufficient at law and was time-barred by an applicable statute of limitations.  The two motions were combined pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 1998)).

On August 27, 1999, the trial court dismissed GAI’s seventh complaint with prejudice based on the three-year limitations period found in section 4-111 of the Illinois Uniform Commercial Code (UCC) (810 ILCS 5/4-111 (West 1996)) and on the loss allocation rule in section 3-404(b) of the UCC (810 ILCS 5/3-404(b) (West 1994)).  On November 23, 1999, the trial court denied GAI’s motion to reconsider.  On December 21, 1999, GAI filed a timely notice of appeal.

On appeal, GAI contends that: (1) the trial court erred in finding that its breach of contract claim was time-barred by the three-year limitations period found in section 4-111, which applies to an improper payment claim under UCC section 4-401(a) (810 ILCS 5/4-401(a) (West 1994)); (2) its breach of contract claim is not time-barred by the three-year limitations period found in section 3-118(g) (810 ILCS 5/3-118(g) (West 1996)), which applies to a conversion of an instrument claim under UCC section 3-420(a) (810 ILCS 5/3-420(a) (West 1994)); (3) the loss allocation rule in section 3-404(b) of the UCC (810 ILCS 5/3-404(b) (West 1994)) does not provide ANB with a defense to GAI's breach of contract claim; the material in this section is nonpublishable under Supreme Court Rule 23.
 (4) it has sufficiently pled a violation of section 9 of the Act (760 ILCS 65/9 (West 1996)); and (5) its claim under the Act is not time-barred by any UCC statute of limitations.  For the reasons that follow, we reverse and remand.

FACTUAL BACKGROUND

In December 1982, the plaintiff, GAI opened a corporate checking account with defendant-bank, ANB.  The account was governed by signature cards and a certified corporate resolution (Certified Resolution) defining the duties and obligations of ANB and GAI in relation to the corporate checking account.

The Certified Resolution provided in relevant part that ANB was:

"hereby authorized and directed to honor and pay all 

checks, drafts or orders so drawn, when so signed, 

whether such checks, drafts or orders be payable to the 

order of any officer or person signing said checks, 

drafts or orders or any of said officers or persons in 

their individual capacities or not, and whether such 

checks, drafts or orders are deposited to the 

individual credit of any officer or person signing said 

checks, drafts or orders or to the individual credit of 

any of the other officers or persons aforesaid or not."       The only persons authorized to sign checks for this account
 were Max Starr, Irene Starr, and Bernard Cohn. Lawrence Cohn (Cohn) was GAI’s comptroller but was not a signator to the account.  Between June 14, 1992, and May 7, 1993, Cohn instructed GAI to issue nine checks, all of which were signed by Max Starr and made payable to the order of ANB and drawn on GAI’s corporate checking account at ANB for the ostensible purpose of paying GAI’s payroll taxes.  Over this 11 month period Cohn deposited the nine unaltered, nonforged checks ranging in amounts from $40,000 to $50,000 each into an automatic teller machine (ATM), with deposit slips attached for deposit into his own personal account.  ANB did not pay itself on any of the checks but rather allowed the checks to be deposited into Cohn’s personal account.  On May 28, 1996, agents from the Internal Revenue Service (IRS) informed GAI that they had uncovered Cohn's embezzlement scheme.  Cohn absconded with all of the funds and GAI sustained losses in excess of $370,000.  On April 30, 1997, GAI filed a two-count complaint against ANB.  Count I sought damages for common law breach of contract, and count II sought damages for violation of section 9 of the Act (760 ILCS 65/9 (West 1992)).

ANALYSIS

Standard of Review

Where a trial court dismisses a complaint under either section 2-615 or section 2-619 of the Code (735 ILCS 5/2-615, 2-619 (West 1998)), this court applies a 
de novo
 standard of review. 
R-Five, Inc. v. Shadeco, Inc.
, 305 Ill. App. 3d 635, 639, 712 N.E.2d 913 (1999).

I. Breach of Contract Claim

GAI first contends that its complaint sufficiently alleged facts establishing a cause of action for common law breach of a written contract.  In response, ANB contends that GAI failed to plead a breach of contract because the Certified Resolution did not obligate ANB to refuse to accept checks payable to itself into an ANB account, and because the breach of contract claim failed to allege the formation and terms of any tax-payment agreement.  We cannot agree with ANB's contentions.

The relationship between a bank and its depositor is contractual in nature. 
National Bank of Monticello v. Quinn
, 126 Ill. 2d 129, 134, 533 N.E.2d 846 (1988).  A binding contract between a bank and its depositor is created by signature cards and a deposit agreement. See, 
e.g.
, 
Your Style Publications, Inc. v. Mid Town Bank & Trust Co.
, 150 Ill. App. 3d 421, 427-28, 501 N.E.2d 805 (1986) (noting that signature card and fee schedule constitute a contract between a bank and its customer); 
Ohio Casualty Insurance Company v. Bank One
, No. 95 C 6613 (N.D.Ill. 1997) (stating that signature cards and deposit agreements for accounts at issue formed a contract between bank and its customer); 
Sanwa Business Credit Corporation v. Continental Illinois National Bank & Trust Company of Chicago
, 247 Ill. App. 3d 155, 160, 617 N.E.2d 253 (1993) (stating that checking account creates a contractual, debtor-creditor relationship between a bank and its customer).  When money is deposited with a bank, title to it passes and the bank becomes a debtor to the extent of the deposit and, to that extent, the depositor becomes a creditor. 
Selby v. DuQuoin State Bank
, 223 Ill. App. 3d 104, 108, 584 N.E.2d 1055 (1991).  In the instant case, GAI's corporate checking account with ANB, along with the signature cards and the Certified Resolution, created a contractual relationship between GAI and ANB.

Implicit in such contracts is the common-law duty of the bank to use ordinary care in disbursing the depositor's funds. 
National Bank of Monticello
, 126 Ill. 2d at 135.  T
his duty of care is based on the well-established common-law rule:

"Where a check drawn to the order of a bank is presented to such bank, and the drawer owes no [debt] to the bank, the bank must see that the proceeds are not misapplied, and cannot without justification divert the proceeds to the use of one other than the drawer, and is authorized to pay the proceeds only to persons specified by the drawer.  The bank takes a risk in treating the check as being payable to the bearer, and is placed on inquiry as to the authority of the drawer's agent to receive payment.  The duty to inquire of the drawer is not satisfied by making inquiry of the bearer.  If the bank assumes without investigation that the instructions of the presenter are those of the drawer, it takes a risk.  Where the drawer's agent or one representing himself or herself to be such is not in fact authorized, the bank is liable to the drawer for paying the check to such person ...." 9 C.J.S. 
Banks and Banking
 § 327, at 316-17 (1996).

See also Annotation, 
Liability of Bank for Diversion to Benefit of Presenter or Third Party of Proceeds of Check Drawn to Bank's Order by Drawer not Indebted to Bank
, 69 A.L.R. 4
th
 778 (1989).

In essence, when a drawer who owes no debt to the bank writes a check payable to the bank's order, the drawer places that check in the bank's custody with the expectation that the bank will negotiate the check according to the drawer's wishes.  Therefore, a bank may not treat the check as bearer paper and blindly disburse the proceeds according to the instructions of any individual who happens to present the check to the bank. 
Mutual Service Casualty Ins. v. Elizabeth State Bank
, 265 F. 3d 601, 613-14 (7th Cir. 2001)
(footnote: 1).

In the present case, ANB's liability rests on the duty of care that it owed to GAI by virtue of their contractual relationship.  The common law imposed on ANB a duty of care to its depositor, GAI, and that implied duty included the obligation to see that the proceeds of checks payable to ANB were not misapplied.

GAI alleges that ANB breached its contractual duty of care, when over an 11 month period it allowed Cohn to deposit into his personal account at ANB
 nine nonforged, unaltered checks ranging in amounts of $40,000 to $50,000 each, even 
though these nine checks were drawn on GAI's corporate account at ANB and
 ANB was the named payee on the checks.  GAI alleges that ANB's wrongful negotiation of these nine checks
 violated the express instructions of the signature cards and Certified Resolution, which formed a contract between GAI and ANB.

We conclude that GAI has set forth sufficient facts to establish that ANB breached its contractual obligation to ensure that the proceeds of the checks payable to ANB's order were not misapplied.  ANB failed to inquire of a GAI official whether Cohn's instructions as to the disposition of these checks was appropriate.  At the same time, GAI never gave ANB any reason to believe that Cohn was empowered to receive the proceeds of checks made payable to ANB.  ANB was placed on notice that Cohn was acting beyond the scope of his authority as GAI's comptroller based upon the face of the checks themselves, which showed that they were payable to ANB. See 
Mutual Service Casualty Ins.
, 265 F. 3d at 621. (stating that a bank has notice of potential foul play when the employee of a drawer attempts to negotiate a check payable to the order of the bank and the drawer is not indebted to the bank; the check itself poses an unanswered question as to whom the bank is to pay).

In an effort to modify or limit its common-law duty of ordinary care, ANB contends that its failure to inquire and examine the checks did not 
amount to bad faith, because Cohn did not deposit the checks with a human bank teller who could obtain knowledge in a face-to-face transaction but, rather, deposited the checks at an ATM, where they were processed by automated means.  In support of this argument, ANB relies upon section 3-103(a)(7) of the UCC, which provides in relevant part:

"In the case of a bank that takes an instrument for processing for collection or payment 
by automated means
, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this Article or Article 4." (Emphasis added.) 810 ILCS 5/3-103(a)(7) (West 1994).

We cannot agree with ANB's argument.  Section 3-103(a)(7) does not provide protection to ANB under the facts in this case, because this provision of the UCC applies specifically to payor banks, which under certain circumstances are excused from visually inspecting the signatures on checks drawn by their customers
(footnote: 2).  Section 3-103(a)(7) was amended to protect payor banks from having to visually inspect drawer signatures, since these banks could fully process checks by electronic information encoded on a MICR line
(footnote: 3) and therefore, no visual inspection was necessary. See B. Clark & B. Clark, 1 Bank Deposits, Collections & Credit Cards,
 § 12.05[7], at 12-160 (rev. ed. 1999).

Official UCC Comment 5 regarding section 3-103(a)(7), states that this particular provision of the UCC "applies primarily to Section 4-406 and it is discussed in Comment 4 to that section." 810 ILCS Ann. 5/3-103 (West 1994).  Comment 4 to section 4-406 states in relevant part:

"
[S]ight examination by a payor bank
 is not required if its procedure is reasonable and is commonly followed by other comparable banks in the area. *** The effect of the definition of 'ordinary care' on Section 4-406 is only to provide that in the small percentage of cases in which a customer's failure to examine its statement or returned items has led to loss under subsection (d) a bank should not have to share that loss solely because it has adopted an automated collection or payment procedure in order to deal with the great volume of items at a lower cost to all customers." (Emphasis added.)
 810 ILCS Ann. 5/4-406, Uniform Commercial Code Comment 4 
(West 1994). 

In the present case, because ANB was the bank of first deposit rather than the payor bank and because the alleged breach of contract claim related to the failure to verify the named payee rather than drawer signatures, section 3-103(a)(7) does not provide ANB with a defense in this case. See B. Clark & B. Clark, 1 Bank Deposits, Collections & Credit Cards, § 12.05[7], at 12-160 (rev. ed. 1999) (stating that, presently, the "'automated-processing' defense and the industry-wide standard now codified in the revised UCC protect payor banks in drawer signature verification cases, but not depository
 banks in ATM deposit cases
").

II. Statute of Limitations

GAI contends that the trial court erred in finding that its breach of contract claim was time-barred by the three-year limitations period found in section 4-111 of the UCC (810 ILCS 5/4-111 (West 1996)), because the claim was for common-law breach of contract and therefore the 10 year limitations period for a common-law breach of contract action should have applied, not the statutory three-year limitations period.

In response, ANB contends that GAI’s breach of contract claim is actually predicated on either the conversion or the improper payment of a negotiable instrument governed by the UCC, and therefore the entire complaint including the breach of contract claim was properly time-barred by either the three-year limitations period found in section 3-118(g), which applies to a conversion of a negotiable instrument claim under section 3-420(a) of the UCC (810 ILCS 5/3-420(a) (West 1994)), or the three-year limitations period found in section 4-111, which applies to an improper payment claim under section 4-401(a) of the UCC (810 ILCS 5/4-401(a) (West 1994)).

A. Conversion of a Negotiable Instrument 

GAI argues that its common-law breach of contract claim cannot be characterized as a claim for conversion of a negotiable instrument under section 3-420(a) of the UCC, because the claim made no allegations of forgery or unauthorized endorsement that would give rise to a conversion, and in addition there was no allegation that ANB converted the checks for its own use.  GAI further argues that section 3-420(a) is inapplicable because it does not provide it with a remedy for its losses since under this section an action for conversion of a check "may not be brought by *** the issuer of the check." 810 ILCS 5/3-420(a)(i) (West 1994).

ANB responds that GAI’s breach of contract claim is actually a claim for conversion under the UCC since ANB would be liable for conversion if it took GAI’s checks for deposit into Cohn’s personal account without GAI’s prior consent.

Section 3-420(a) provides in relevant part:

"(a)  An instrument is *** converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment."  810 ILCS 5/3-420(a) (West 1994).

The elements of a cause of action for conversion of a negotiable instrument are "plaintiffs’ ownership of, interest in or right to possession of the check; plaintiffs’ forged or unauthorized endorsement on the check; and defendant bank’s unauthorized cashing of the check." 
Burks Drywall, Inc. v. Washington Bank & Trust Co.,
 110 Ill. App. 3d 569, 573, 442 N.E.2d 648 (1982).

In 
P.M.F. Services
, the court -- citing to 
Burks Drywall
 and noting that the elements of common-law and statutory conversion do not differ -- found that the plaintiff-corporation failed to state a cause of action for common-law conversion because the complaint, 
inter alia
, did not allege that the corporation’s endorsement was forged. 
P.M.F. Services, Inc. v. Grady,
 681 F. Supp. 549, 558 (1988).

In the present case, the record shows that Cohn deposited the checks into an ATM without forging or altering the checks.  Therefore, based on the reasoning given in 
P.M.F. Services,
 section 3-420(a) does not apply in this case.  Additionally, section 3-420(a) is inapplicable because under this section the issuer of the instrument cannot bring an action for conversion of the instrument. 810 ILCS 5/3-420(a)(i) (West 1994).

Accordingly, GAI’s breach of contract claim cannot be characterized as a conversion claim under either section 3-419 or section 3-420, and thus the conversion statute of limitations section 3-118(g) does not apply to time-bar GAI’s breach of contract claim.  

B. Improper Payment of a Negotiable Instrument 

GAI contends that the trial court erred in applying section 4-111’s three-year limitations period to its common-law breach of contract claim because ANB failed to cite a case in which a common-law breach of contract claim was precluded by section 4-111.  GAI also contends that ANB failed to cite a case in which section 4-401 provided a remedy for improper payment of checks.

In response, ANB contends that section 4-401 applies to situations precisely like this, where a payment is alleged to be in breach of the bank-customer contract.  ANB contends that section 4-401 applies because ANB could only charge GAI’s account for the checks if they were properly payable to Cohn, and if they were not, the bank-customer contract was thereby breached and GAI should have brought an action for improper payments under section 4-401(a) of the UCC.

Section 4-401(a) provides in relevant part:

"(a)  An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and bank." 810 ILCS 5/4-401(a) (West 1994).

In 
In re Ostrom,
 the court stated that when a bank makes an improper payment the drawer of a check has no conversion remedy against the bank because the check merely represents the drawer’s obligation and not its property, but the drawer can bring an action for improper payment under section 4-401(a) and have its account recredited.  

In re Ostrom-Martin, Inc. v. First National Bank of Chillicothe,
 188 B.R. 245, 252 (1995).

In the present case, GAI contends that even though it possibly could have brought a section 4-401(a) claim against ANB for improper payment, this section of the UCC does not displace its common-law breach of contract claim.  We agree.

1. Displacement 

ANB maintains that the common-law duty of ordinary care on which GAI's breach of contract claim is based has been displaced by the UCC.  However, nothing in the UCC, as adopted by the Illinois legislature, has displaced this common-law duty. See 
Mutual Service Casualty Ins.
, 265 F. 3d at 614.  In fact, the UCC authorizes the use of contract or equity claims where the UCC does not cover a particular topic or transaction. 
Meng v. Maywood Proviso State Bank
, 301 Ill. App. 3d 128, 133, 702 N.E.2d 258 (1998).  Section 1-103 of the UCC provides that "[u]nless displaced by the particular provisions of this Act, the principles of law and equity *** shall supplement its provisions." 810 ILCS 5/1-103 (West 1994).  Presently, there is no provision of the UCC that delineates what a bank's rights and obligations are when an individual presents a corporate check payable to the bank and then instructs the bank to divert the proceeds of the check to his own benefit. See 
Mutual Service Casualty Ins.
, 265 F. 3d at 614.
     

Moreover, 
the UCC prohibits a bank from disclaiming its ordinary duty of care.  Section 4-103(a) of the UCC provides in relevant part:

"[T]he parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." 810 ILCS 5/4-103(a) (West 1996).

Thus, the common-law duty of ordinary care underlying GAI's breach of contract claim is not a duty that is foreign to the UCC.  Consequently, notwithstanding the enactment of the UCC, courts in Illinois and in other jurisdictions around the country have continued to apply the common-law rule of ordinary care on which GAI's breach of contract claim is based. See, 
e.g.
,
Mutual Service Casualty Ins.
, 265 F. 3d at 613-15; 
Terre Haute Industries, Inc. v. Pawlik
, 765 F.Supp. 925 (N.D.Ill. 1991);
 
Govoni & Sons Construction Co. v. Mechanics Bank
, 51 Mass. App. Ct. 35, 41, 742 N.E.2d 1094, 1100 n. 15 (2001) (stating that "the cases following this rule, both before and after the emergence of the code, are legion");
 Dalton & Marberry, P.C. v. Nationsbank, N.A.
, 982 S.W.2d 231 (Mo. 1998); 
Bank of Southern Maryland v. Robertson's Crab House, Inc.
, 39 Md. App. 707, 389 A.2d 388 (1978).  The UCC does not immunize a bank from its own failure to exercise ordinary care in handling its depositor's accounts.  Therefore, section 4-401(a) does not displace GAI's common-law breach of contract claim.
 

C. Applicable Statute of Limitations

GAI asserts that since section 4-401(a) does not displace its common-law breach of contract claim, then section 4-111's three-year statute of limitations does not apply, and instead the applicable statute of limitations is the 10 year limitations period for a written contract found in section 13-206 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/13-206 (West 1994)).  ANB responds that section 4-111's limitations period applies because in this case, it is more specific than the 10 year limitations period found in section 13-206 of the Code.

We agree with ANB, because "[w]here two statutes of limitation arguably apply to the same cause of action, the one which more specifically relates to the action must be applied." 
Haddad’s of Illinois, Inc., v. Credit Union 1 Credit Union,
 286 Ill. App. 3d 1069, 1072, 678 N.E.2d 322 (1997).

Under the Illinois Code of Civil Procedure, the applicable statute of limitations for a written contract is 10 years. 735 ILCS 5/13-206 (West 1994).  Section 13-206 provides in pertinent part:

"[A]ctions on bonds, promissory notes, bills of
 exchange, written leases, written contracts, or other evidences of indebtedness in writing, shall be commenced within 10 years next after the cause of action accrued;" 735 ILCS 5/13-206 (West 1994).

On the other hand, an action to enforce an obligation, duty, or right arising under Article 4 of the UCC, which governs bank deposits and collections, must be commenced within three years after the cause of action accrues. Section 4-111 provides:

"An action to enforce an obligation, duty or right arising under this Article must be commenced within 3 years after the cause of action accrues." 810 ILCS 5/4-111 (West 1996).

A comparison of sections 13-206 and 4-111 shows that section 4-111 more specifically relates to the banking transactions that GAI contends breached the customer-bank contract.  Section 13-206 is a general, catch-all statute that applies not only to written contracts but also to actions on bonds, bills of exchange, promissory notes, written leases and other evidences of indebtedness.  Whereas section 4-111 specifically relates to a bank’s duties and obligations to its customer when the customer has filed a timely claim.

A primary purpose of a statute of limitations is "to promote certainty and finality in the administration of affairs." 
Hupp v. Gray,
 73 Ill. 2d 78, 88, 382 N.E.2d 1211 (1978) superseded by statute as stated in 
Declerck v. Simpson
, 143 Ill. 2d 489, 577 N.E.2d 767 (1991).  This is especially important in commercial transactions involving negotiable instruments where "the commercial policies underlying the Code require liability on negotiable instruments not be open-ended." 
Haddad’s,
 286 Ill. App. 3d at 1074.  The court in 
Haddad’s
 stated:

"Negotiability requires predictability and rapid collection through payment channels.  Closely related to negotiability are commercial finality and certainty. 'The finality of transactions promoted by an ascertainable definite period of liability is essential to the free negotiability of instruments on which commercial welfare so heavily depends.'" 
Haddad's
, 286

Ill. App. 3d at 1075, quoting 
Menichini v. Grant
, 995 F. 2d 1224, 1230-31 (3rd Cir. 1993).

Article 4 (bank deposits and collections) adopts a three-year limitations period.  Applying the 10 year limitations period to a breach of contract claim involving negotiable instruments that are deposited into and paid by the banking system would not foster and promote commercial finality and certainty.  Therefore, we hold that section 4-111's limitations period applies, because in this case it is more specific than the 10 year limitations period found in section 13-206 of the Code.

However, the application of section 4-111's three-year limitations period does not necessarily time-bar GAI's breach of contract claim under the facts in this case.
  As previously stated, section 4-111 provides that an action to enforce an obligation, duty, or right arising under Article 4 must be commenced within three years after the cause of action accrues. 810 ILCS 5/4-111 (West 1996).  But there is no provision made as to when a cause of action accrues nor as to what conduct tolls the running of the statute of limitations; therefore, the pre-UCC law governs the determination of these questions. See 10 Am. Jur. 2d 
Banks & Financial Institutions
 § 767 (1997).

In determining when a cause of action accrues our courts have applied the discovery rule, which provides that a cause of action accrues when the plaintiff 
knows or reasonably should know of the injury and that the injury was wrongfully caused. 
King v. Paul J. Krez Company
, 323 Ill. App. 3d 532, 541, 752 N.E.2d 605 (2001), citing 
Knox College v. Celotex Corporation
, 88 Ill. 2d 407, 414-17, 430 N.E.2d 976 (1981). The discovery rule was created to alleviate the harsh consequences that would flow from a literal application of a limitations period. 
Lowe v. Ford Motor Company
, 313 Ill. App. 3d 418, 420, 730 N.E.2d 58 (2000).
 Where the discovery rule applies, the relevant statute of limitations is tolled until the plaintiff knows or reasonably should know of the wrongfully caused injury. 
Lease Resolution Corporation v. Larney
, 308 Ill. App. 3d 80, 86, 719 N.E.2d 165 (1999).

Generally, the date that the plaintiff has or should have the requisite knowledge to trigger the limitations period is a question of fact.
 Swann & Weiskopf v. Meed Associates
, 304 Ill. App. 3d 970, 975, 711 N.E.2d 395 (1999).  The question may be determined as a matter of law, however, when the answer is clear from the pleadings. 
Clay v. Kuhl
, 189 Ill. 2d 603, 609-10, 727 N.E.2d 217 (2000).  In the instant case, we do not believe that the alleged facts allow this issue to be resolved as a matter of law.  We believe that there is an issue of fact regarding when GAI reasonably should have known that Cohn was embezzling its funds.

The facts show that the thefts began on June 14, 1992, and ended on May 7, 1993, each for a substantial amount of money, adding up to more than $370,000.  That amount is not a trivial sum.  It could be argued that GAI should have noticed these thefts before May 28, 1996, the date agents from the IRS informed GAI that they had uncovered Cohn's embezzlement scheme.  GAI contends that there was no way it reasonably should have known 
that Cohn was embezzling 
the checks since they contained no forged signatures or unauthorized endorsements and 
were made payable to the order of ANB 
for the purpose of paying GAI’s payroll taxes.  GAI maintains that it did not discover that ANB was not paying itself on any of the checks
 until the IRS informed GAI that it had uncovered Cohn's embezzlement scheme.
  Nonetheless, we believe that there is a fact issue concerning whether GAI should have discovered the thefts some time before May 28, 1996.  In addition, the record shows that even after GAI was informed of Cohn's embezzlement scheme by the IRS, GAI waited 11 months before filing a complaint.
  
For these reasons, we remand for a trial on whether section 4-111's limitations period 
had run.

ANB contends that GAI's cause of action accrued in May, 1993, the date the last check was negotiated and cites to 
Haddad's
 in support of this contention.

In 
Haddad's
 the court refused to apply the discovery rule to a cause of action for conversion of a negotiable instrument 
under section 3-420(a) of the UCC, in the absence of fraudulent concealment on the part of the defendant asserting the defense of the statute of limitations. 
Haddad's
, 286 Ill. App. 3d at 1073.  The court based its finding principally on the ground that in the absence of fraudulent concealment, the victim of a conversion is in the best position to detect the loss and take appropriate action. 
Haddad's
, 286 Ill. App. 3d at 1075.  Consequently, the court concluded that under the circumstances in the case, 
the cause of action for a negotiable instrument accrues when the instrument is negotiated. 
Haddad's
, 286 Ill. App. 3d at 1075.

Haddad's
 is inapplicable here, because this case deals with a breach of contract claim involving negotiable instruments, not a conversion claim involving negotiable instruments.  Unlike the situation in 
Haddad's
, where absent fraudulent concealment, the victim of the conversion is in the best position 
to detect a forged signature or unauthorized endorsement, the checks at issue in the present case where drawn to the order of the bank, ANB, and contained no forged signatures or unauthorized endorsements.

III. Section 3-404(b) defense

The material in this section is nonpublishable under Supreme Court Rule 23.
 

IV. Illinois Uniform Fiduciaries Act

GAI finally contends that its claim under the Act was sufficient enough to avoid dismissal for failure to state a cause of action, where the claim alleged that ANB acted in bad faith by allowing Cohn to randomly deposit the checks into his own personal account.  In response, ANB contends that the trial court properly dismissed GAI’s claim because the Act does not create an affirmative cause of action, but rather, provides a defense to a negligence claim.  ANB further asserts that even if the Act creates a cause of action, the Act provides ANB with a complete defense because GAI failed to allege sufficient facts which indicated that ANB had actual knowledge of Cohn’s embezzlement or that ANB's actions in paying the checks amounted to bad faith.

The Act was enacted to "'facilitate the fiduciary's performance of his responsibilities by limiting the liability of those who deal with him,' and 'to cover situations which arise when one person honestly deals with another knowing him to be a fiduciary." 
Appley v. West
, 832 F.2d 1021, 1031 (7th Cir. 1987)
.  The Act relieves the bank of liability for negligence and acts as a defense to allegations that the bank acted negligently.
 Appley,
 832 F.2d at 1031.  
However, a party can recover under the Act if it can prove that the 
bank had actual knowledge of the fiduciary’s misappropriation of the principal’s funds or that the bank had knowledge of sufficient facts that its action in paying over the funds amounted to bad faith. 
Appley,
 832 F.2d at 1031.

"'Actual knowledge' has been defined as the awareness at the moment of the transaction that the fiduciary is defrauding the principal. 'It means express factual information that the funds are being used for private purposes in violation of fiduciary relationship.'"  
Master Chemical Corporation v. Inkrott,
 55 Ohio St. 3d 23, 28, 563 N.E.2d 26 (1990).  In determining whether a bank has acted in bad faith, "courts have asked whether it was 'commercially' unjustifiable for the payee to disregard and refuse to learn facts readily available. [Citation]. At some point, obvious circumstances become so cogent that it is 'bad faith' to remain passive." 
Appley
 832 F.2d at 1031.

In regard to "actual knowledge" and "bad faith," the case of 
Master Chemical Corporation v. Inkrott,
 55 Ohio St. 3d 23, 28, 563 N.E.2d 26 (1990),
 
is instructive.  In 
Inkrott
, a company’s comptroller embezzled corporate funds by driving to the bank’s drive-in window and depositing corporate checks payable to the order of the bank and intended as payment of the corporation’s taxes, into his own personal account rather than into the designated tax deposit account.  The Ohio Supreme Court decided to address the issue of whether the bank could use the Ohio Uniform Fiduciaries Act (Ohio Act)
(footnote: 4) as a defense to allegations of wrongful payment. 
Inkrott
, 55 Ohio St. 3d at 26.

In applying the Ohio Act to the facts in the case, the Ohio Supreme Court determined that the bank did not have actual knowledge that the comptroller was defrauding his company, at the time of the transactions
. 
Inkrott
, 55 Ohio St. 3d at 28.
  However, the court did find that the bank acted in bad faith in paying the checks where the bank had "established a procedure where a transfer from one corporate account to another would be presumed correct and would not be questioned." 
Inkrott
, 55 Ohio St. 3d at 28.  The Ohio Supreme Court determined that it was commercially unjustifiable for the bank to institute a procedure that permitted this type of theft to occur.  The court noted: 

"In an age of white-collar crime, it is more than negligent for a bank to make such a presumption in the development of its policies when dealing with fiduciaries presenting checks payable to the bank." 
Inkrott
, 55 Ohio St. 3d at 28.

The Ohio Supreme Court also noted that the bank could not avoid the directives of the Uniform Commercial Code and Uniform Fiduciaries Act by contending that it would be economically unfeasible to institute changes that would more closely scrutinize the transactions at issue. 
Inkrott
, 55 Ohio St. 3d at 28.

In the instant case, GAI contends that it stated a cause of action under section 9 of the Act
(footnote: 5), when it alleged that ANB acted in bad faith by permitting Cohn to randomly deposit nine unaltered checks ranging in amounts from $40,000 to $50,000 each, payable to ANB for the purpose of paying GAI's payroll taxes, into his own personal account.
  In response, ANB contends that the trial court properly dismissed GAI's Act claim pursuant to section 2-615 of the Code, because GAI failed to allege that the individuals handling the checks had actual notice that Cohn was breaching his fiduciary duty, or had knowledge of such facts that their actions in paying the checks amounted to bad faith.

In the present case, GAI’s allegations do not establish that ANB had actual knowledge at the time of the transactions that Cohn was defrauding GAI, because Cohn deposited the checks into an ATM and did not present the checks to a clerk who could visually inspect the checks to determine whether they were being deposited into an account other than that of the named payee.  However,
 GAI’s seventh complaint includes enough facts and allegations to support its claim that
 ANB acted in bad faith when it paid the checks to Cohn.

Applying the analysis given in 
Inkrott
 to the facts in the present case, reveals that it was commercially unreasonable for ANB to establish and maintain an ATM deposit procedure that allowed Cohn to randomly deposit nine unaltered, nonforged checks in the amounts of $40,000 to $50,000 each into his personal account, where he was not a signator to the account, and where the checks were payable to the order of ANB and drawn on GAI’s corporate account at ANB.  Bank employees eventually examine checks that are deposited into an ATM just as if they were presented to a bank teller.  Therefore ANB’s failure to examine GAI’s checks is not excused by the fact that Cohn deposited the checks into an ATM.

GAI’s seventh complaint includes enough facts and allegations to support its claim that
 ANB acted in bad faith when it paid the checks to Cohn.  Therefore, GAI's bad faith claim under the Act provides it with a viable legal theory on which it can possibly recover.  Moreover, pursuant to the previously discussed discovery rule, section 4-111's three-year limitations period does not time-bar GAI's bad faith claim under the Act.

Accordingly, for the reasons set forth above, we reverse the circuit court's dismissal of count I (breach of contract) and count II (Act claim)
 in GAI's seventh complaint.

Reversed and remanded.

CERDA and WOLFSON, JJ., concur. 

FOOTNOTES
1: 
 Even though 
Mutual Service Casualty Ins.
 is a federal case and decisions of the federal court are not binding on this court (
Cameron v. Bogusz
, 305 Ill. App. 3d 267, 273, 711 N.E.2d 1194 (1999)), a federal court's interpretation of Illinois law is persuasive unless it runs contrary to previously decided state cases which if correctly reasoned will not be overturned. 
In re Consolidated Objections to Tax Levies of School District No. 205
, 306 Ill. App. 3d 1104, 1113, 715 N.E.2d 1212 (1999).  

2: The facts in this case indicate that ANB acted as a depository-payee bank in relation to the checks at issue.  Section 4-105(2) defines a depository bank as: "the first bank to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter." 810 ILCS 5/4-105(2) (West 1994).  On the other hand, a payor bank is defined as "a bank that is the drawee of a draft." 810 ILCS 5/4-104 (3) (West 1994).    

3: The "MICR" (magnetic ink character recognition) line is a line on the bottom of the check composed of coded characters representing: the amount of the check, transaction code, drawee-payor bank's federal reserve and transit numbers, and other auxiliary information. J. Vergari, 
MICR Automated Check Processing
, 601 ALI-ABA 183, 187 (1991).      

4: Ohio STAT. tit. XIII, § 1339.01 
et seq.
 (1994). 

5: 
 Section 9 of the Act, provides in relevant part:

"If a fiduciary *** otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit of any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is
 
committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the checks amounts to bad faith." 760 ILCS 65/9 (West 1996).